REIFF & BILY
*By: Raymond Bily, Esquire*
Attorney I.D. #
1429 Walnut Street
12th Floor
Philadelphia, PA 19102
(215) 246-9000                                                     *Attorneys for Plaintiffs*

---

### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KATHERINE ELIZABETH NEIMER, | : Docket No. 02-CV-4034 |
| a minor, by and through JAMES J. NEIMER | : |
| and REBECCA NEIMER, her parents and | : |
| natural guardians, | : |
| Plaintiffs | : |
| | : |
| v. | : |
| | : Assigned to: |
| CITY OF LANCASTER, LANCASTER | : Honorable Clarence C. Newcomer |
| RECREATION COMMISSION, and | : |
| ISMAEL ALVAREZ, | : Jury Trial Demanded |
| Defendants | : |

---

### PRETRIAL MEMORANDUM

---

## I.      STATEMENT OF THE NATURE OF THE CASE

This case is an action brought pursuant to 42 U.S.C. §1983 by the Plaintiff, Katherine Elizabeth Neimer ("Katherine"), a minor, by her parents and natural guardians, James Neimer and Rebecca Neimer. This case arises from a sexual assault on Katherine by her teacher, Defendant, Ismael Alvarez ("Alvarez") while Katherine was a fourth grade student at Hamilton Elementary School of the Lancaster School District. At the time of the assault, Katherine was enrolled in and under the supervision of the School Age Care/Before School Care Program, run by the Defendants, Lancaster

Recreation Commission ("LRC"), an instrumentality in partnership with Defendant, City of Lancaster ("City").

The assaults at issue occurred on December 21 and 22, 2000, when Katherine was nine (9) years of age. Alvarez was Katherine's teacher. On those two days, Alvarez asked the Director of the Before School Care Program at Hamilton Elementary School, Michelle Bair ("Bair") for permission to allow Katherine to come to his classroom with him, on the pretense of helping him out with work. In spite of a written policy which prohibited students from being released to individuals who were not expressly authorized by the student's parents, Bair, following an informal, unwritten practice, released Katherine to Alvarez.

On those two days, Alvarez inappropriately touched and fondled Katherine, both under and over her clothing. On the second day, Katherine told Alvarez to stop, which he did, admonishing Katherine not to tell anyone. Katherine, that evening, told her father, who called the police. Alvarez was subsequently arrested, and ultimately pled guilty to two counts of Indecent Assault and one count of corruption of the morals of a minor. Alvarez was sentenced to eight to twenty-three months in prison, two years of probation, fines, restitution, and registration under Pennsylvania's version of Megan's Law for ten years.

Plaintiffs initially filed their complaints for civil rights violations and pendent state law tort claims against the Lancaster School District; its Superintendent, Vicki Phillips; the building principal at Hamilton Elementary School, Gloria Campbell; the City of Lancaster, the Lancaster Recreation Commission and its Chairman, Donald Yeager. The School District Defendants and Yeager were dismissed from the case under Rule 12(b)(6), with the claims remaining against Alvarez, the City, and LRC.

It is respectfully submitted that the policies, practices, and customs of the City and the LRC were a cause of the deprivation of Katherine's right to bodily integrity and freedom from sexual assaults.  Namely, the custom, unwritten policy, and practice of the Before School Care program, in releasing students to unauthorized persons, facilitated the assault and gave Alvarez the opportunity to stalk, isolate, and sexually assault Katherine.  The City and LRC failed to properly train, supervise, and monitor day care providers, and allowed practices which ultimately facilitated the assault of Katherine.

## II.    <u>WITNESSES</u>

1.    Rebecca Neimer

    a.    That she is Katherine Neimer's mother.

    b.    That Katherine was, in the 2000-2001 school year, a fourth grade pupil at Hamilton Elementary School.

    c.    That Katherine was nine years of age in December of 2000.

    d.    That Katherine's fourth grade teacher was Ismael Alvarez.

    e.    That Alvarez had told the Neimers that he wanted Katherine to be in his class.

    f.    That Alvarez seemed to take "special interest" in Katherine.

    g.    That Alvarez invited Katherine to skating events and astronomy nights.

    h.    That Katherine was enrolled in the Before School Care Program of the School Age Care Program offered by the Lancaster Recreation Commission.

        1.    That she had registered Katherine for the program.

        2.    That the program gave her a handbook and promotional materials.

3.      That the promotional materials represented that students would not be released to unauthorized persons.

4.      That she had given the names of people to whom Katherine could be released, and Ismael Alvarez was not one of them.

5.      That she paid on a weekly basis for Katherine's enrollment in the program.

6.      That Katherine would be dropped off at the school to the program and signed in.

7.      That on at least one occasion, she looked for Katherine when picking her up, and found her with Alvarez, and complained to Bair that Bair was not keeping proper control of and track of childrens' whereabouts.

i.      That on December 21 and 22, 2000, Katherine was in the Before School Care Program.

j.      That on the evening of December 22, 2000, Katherine's father related to her that Katherine had reported being improperly sexually touched by Alvarez on the mornings of December 21 and 22, 2000, in his classroom, after she was released to Alvarez by Bair from the Before School Care Program area.

k.      That the Lancaster Bureau of Police was called, and that Lancaster County Children and Youth Services was informed of the incidents.

l.      That Alvarez was arrested and was removed from teaching duties after Christmas.

m.      That Katherine suffered considerable guilt, shame, emotional distress, and loss of self-esteem after this episode.

n.    That Katherine underwent a physical examination and psychological counseling, and will have residual effects of this episode.

o.    That she (Rebecca) had to take time off from work, without pay, as a result of this episode.

p.    That Katherine's care after this incident caused the Neimers to incur medical bills and lost time from work.

q.    That the Neimers relocated after this incident, and that Katherine attended a different elementary school.

r.    Regarding the reaction of other students and parents to the incident, and speculation as to who was the parent who had reported Alvarez to the police.

2.    James Neimer

a.    All matters which were the subject of testimony of Rebecca Neimer.

b.    That he is Katherine Neimer's father.

c.    Katherine's date of birth.

d.    Katherine's grade in school and classroom assignment at the time of the incident with Alvarez.

e.    That he is married to Rebecca Neimer and date of marriage.

f.    That he is employed by the City of Lancaster as a police officer.

g.    The length of his employment as a police officer.

h.    That Alvarez was known to the Neimers and that Alvarez seemed to take "special interest" in Katherine and wanted her to be in his class.

i.    That Katherine was a student in the School Age Care/Before School Care Program of Lancaster School District.

j.     That there were days he would drop Katherine off at school before school hours, to be cared for by the program until school began.

k.     Mr. Neimer's understanding with respect to written policies distributed to parents of students in the Program prohibiting release of students to persons other than those authorized by the parents.

l.     That he had never authorized Katherine to be released by Program employees or officials to Alvarez.

m.     That on December 22, 2000, Katherine told him that Alvarez had taken her to his classroom on both that day and the day before from the Before School Care area, and had touched her in an inappropriate manner while they were alone in Alvarez's classroom.

n.     That Mr. Neimer told Mrs. Neimer what had happened, and that they called the Lancaster Bureau of Police.

o.     That a police investigation followed, leading to Alvarez's arrest and ultimate guilty plea to Indecent Assault and Corruption of the Morals of a Minor, and that Alvarez was sentenced to prison.

p.     That the Department of Public Welfare and Lancaster County Children and Youth Services had also investigated the allegations made by Katherine and found them to be credible.

q.     That Katherine suffered depression, guilt, and loss of self-esteem as a result of this incident.

r.     That Katherine underwent counseling in the weeks and months after this incident.

s.    That Katherine has seen considerable improvement, but may suffer residual effects from this incident.

3.    Katherine Neimer

a.    All issues which were the subject of testimony of James Neimer and Rebecca Neimer.

b.    That Bair, the Director of the Before School Care Program, released Katherine to Alvarez on December 21, 2000 and again on December 22, 2000, which were the dates on which the assaults occurred.

c.    The Christmas gifts and thank-you notes sent by Alvarez.

d.    That she and her friend Shannon, had, in the past, sat on Alvarez's lap and under his desk in the presence of others.

e.    The after-effects of the assault.

4.    Ismael Alvarez (as on cross examination)

a.    That he was Katherine's classroom teacher at Hamilton Elementary School in the 2000-2001 school year.

b.    That Katherine was a student in the Before School Care Program, and that Bair released Katherine to him on the mornings of December 21, 2000 and December 22, 2000, without any questions or hesitation.

c.    That neither Mr. Neimer nor Mrs. Neimer had ever authorized that Katherine be released to him from day care.

d.    That he sexually assaulted Katherine on December 21, 2000 and December 22, 2000, as set forth in the Guilty Plea Colloquy.

5.    Elizabeth Hosterman, M.A.

a.    Credentials/*curriculum vitae*

b.      That she is familiar with Katherine Neimer.

c.      That Katherine first presented several weeks after the assault by Alvarez.

d.      Course of treatment

1.      Symptoms

2.      Counseling sessions/frequency

3.      Improvement over time

4.      Relatedness of symptoms to sexual assault

e.      Summary of treatment

f.      Prognosis and potential for future problems (e.g., anxiety in relationships with males).

g.      Reasonableness and necessity of treatment rendered.

h.      Reasonableness of bills for services rendered.

i.      Rendering of opinions with reasonable degree of professional certainty.

6.      Donald Yeager, Lancaster Recreation Commission Chairman (as on cross)

a.      Employment with the Lancaster Recreation Commission.

b.      Education/work experience.

c.      The relationship between the City of Lancaster and the Lancaster Recreation Commission.

d.      Description of the School Age Care Program

i.      Interrelationship for purposes of this Program of the Lancaster School District, the City of Lancaster, and the Lancaster Recreation Commission.

    ii.       Purposes of the School Age Care Program.

    iii.      Program descriptions.

e.      Qualifications required for employees of the programs

    i.        Education

    ii.       Experience

    iii.      Background Check

    iv.     Continuing education

    v.       Education (or lack thereof) in child abuse and abuser identification/prevention.

f.      That there was an Employee Handbook during all times relevant to this matter.

g.    That the Employee Handbook contained policies and procedures that employees were to follow in the School Age Care Program.

h.    That the Employee Handbook had provided that students were not to be released to persons other than those authorized by parents or guardians.

i.    That this policy was, in actuality, contradicted by an informal policy of releasing children to their teachers upon request prior to school hours.

j.    That the registration form contained spaces for emergency contacts and authorized persons to whom the program employees could release students.

k.    That looking at Katherine Neimer's registration form, Ismael Alvarez was not listed as a person to whom Katherine could be released.

l.    That the Parent Handbook and Flyer circulated to parents advertising the availability of the program also stated strict guidelines prohibiting release of students to unauthorized persons.

m.    That the Employee Manual had a procedure for signing children in and out.

n.    Instances where this procedure was not followed at Hamilton Elementary School.

o.    That parents paid for the School Age Care Program on a weekly basis, and were given receipts.

p.    That over Christmas vacation, Yeager learned of the Alvarez incident.

q.    That Michelle Bair had been in charge of the program at Hamilton Elementary School.

r.    That after the incident, the police called, seeking a statement from Bair.

s.    That he read Bair's statement.

t.    That after the Neimer/Alvarez incident, there was new instruction given to program staff not to release students to any unauthorized individual – even then building principal.

7.    Susan E. Abele

a.    Employment with the Lancaster Recreation Commission.

b.    Education/work experience.

c.    The relationship between the City of Lancaster and the Lancaster Recreation Commission.

d.    Description of the School Age Care Program

        i.      Interrelationship for purposes of this Program of the Lancaster School District, the City of Lancaster, and the Lancaster Recreation Commission.

        ii.     Purposes of the School Age Care Program.

        iii.    Program descriptions.

e.     Qualifications required for employees of the programs

        i.      Education

        ii.     Experience

        iii.    Background Check

        iv.    Continuing education

        v.     Education (or lack thereof) in child abuse and abuser identification/prevention.

f.     That there was an Employee Handbook during all times relevant to this matter.

g.    That the Employee Handbook contained policies and procedures that employees were to follow in the School Age Care Program.

h.    That the Employee Handbook had provided that students were not to be released to persons other than those authorized by parents or guardians.

i.     That this policy was, in actuality, contradicted by an informal policy of releasing children to their teachers upon request prior to school hours.

j.     That the registration form contained spaces for emergency contacts and authorized persons to whom the program employees could release students.

k.    That looking at Katherine Neimer's registration form, Ismael Alvarez was not listed as a person to whom Katherine could be released.

l.    That the Parent Handbook and Flyer circulated to parents advertising the availability of the program also stated strict guidelines prohibiting release of students to unauthorized persons.

m.    That the Employee Manual had a procedure for signing children in and out.

n.    Instances where this procedure was not followed at Hamilton Elementary School.

o.    That parents paid for the School Age Care Program on a weekly basis, and were given receipts.

p.    That over Christmas vacation, Abele learned of the Alvarez incident.

q.    That Michelle Bair had been in charge of the program at Hamilton Elementary School.

r.    That after the incident, the police called, seeking a statement from Bair.

s.    That she read Bair's statement.

t.    That after the Neimer/Alvarez incident, there was new instruction given to program staff not to release students to any unauthorized individual – even then building principal.

8.    Michelle Bair

a.    All topics of Yeager's and Abele's testimony.

b.    Familiarity with Katherine.

c.    Familiarity with Alvarez.

d.     That on December 22, 2000, Alvarez came to the Before School Care Room and requested that Katherine be released to him to help with work.

e.     That on both days, Alvarez was allowed to sign Katherine out.

f.     That this occurred at about 7:30 a.m.

g.     That school did not start until approximately 8:30 a.m.

h.     That over Christmas vacation, the Lancaster Police contacted Bair and asked her for a statement as to her knowledge of facts relating to the alleged incident.

i.     That Bair gave the police a statement.

j.     That Bair was never disciplined by her employer for the incident in question.

k.     That Bair was told by other school employees of Alvarez's bizarre teaching style and seemingly not keeping appropriate boundaries with students.

l.     That written policies regarding sign-in/sign-out and release of students was not always complied with, and students were routinely released to teachers without parental authorization.

9.     Det. Sgt. Erik Abel (if not stipulated)

a.     Police investigation

i.     Interviews with Katherine consistent and credible.

b.     Arrest of Alvarez.

c.     Guilty plea of Alvarez.

d.     Sentence of Alvarez.

10.     Peg Aliceo, Teacher

    a.      That she regularly observed female students on Defendant Alvarez' lap.

    b.      That she observed female students under and within the cavity of Alvarez' desk while Alvarez was seated at the desk.

11.   Sue Wise Teacher's Aid

    a.      That on several occasions she observed children under and within the cavity of Alvarez' desk while Alvarez was seated at the desk.

    b.      That she observed female students leaning against Alvarez' thigh while Alvarez was reading to the class.

    c.      That she observed Alvarez standing behind and over female students.

12.   Dianna King, Teacher's Aid

    a.   That she noted Defendant Alvarez kept his room blinds drawn shut and that the room door window was covered.

13.   William Way,  Teacher

    a.      That he observed female students on Alvarez' lap on several occasions.

14.  Sue Stephopolus, Teacher

    a.      That she observed two female students, each of whom was seated on Defendant Alvarez' knees at the same time.

15.   Karen Ward, Teacher

    a.      That she observed two female students, each of whom was seated on Defendant Alvarez' knees at the same time.

### III.     PROPOSED STIPULATIONS

1.      Katherine Elizabeth Neimer was a pupil enrolled in the grade at Hamilton Elementary School of Lancaster School District during the 2000-2001 school year.

     a.      Katherine Neimer is the daughter of James and Rebecca Neimer.

2.      Katherine was nine (9) years old during all time periods relevant to this case.

3.      Katherine's teacher for the 2000-2001 school year was Defendant, Ismael Alvarez.

4.      Defendant, Alvarez, has been employed by the School District since 1988.

5.      Defendant Alvarez acted under color of state law during all time periods relevant to this case.

6.      Katherine was enrolled in the School Age Care Program offered by the Lancaster Recreation Commission.

7.      Donald Yeager is and was during all time periods relevant hereto, Director of the Lancaster Recreation Commission.

8.      Donald Yeager acted under color of state law during all time periods relevant to this case.

9.      Defendant, Lancaster Recreation Commission is an agency associated with Defendant, City of Lancaster, under a Partnership Agreement.

10.     Susan E. Abele is Executive Director of the LRC.

11.     Susan E. Abele acted under color of state law during all time periods relevant to this case.

12.    Michelle Bair, during all times relevant hereto, was the Director of the Before School Care Program at Hamilton Elementary School.

13.    Michelle Bair acted under color of state law during all time periods relevant to this case.

14.    Teacher Peg Aliceo regularly observed female students on Defendant Alvarez' lap and female students under and within the cavity of Alvarez' desk while Alvarez was seated at the desk.

15.    Peg Aliceo acted under color of state law during all time periods relevant to this case.

16.    Teacher's Aid, Sue Wise, observed children under and within the cavity of Alvarez' desk while Alvarez was seated at the desk.

17.    Sue Wise acted under color of state law during all time periods relevant to this case.

18.    Teacher's Aid, Dianna King, noted that Defendant Alvarez kept his room blinds drawn shut and the room door window covered.

19.    Dianna King, acted under color of state law during all time periods relevant to this case.

20.    Teacher William Way, observed female students on Alvarez' lap on several occasions.

21.    William Way acted under color of state law during all time periods relevant to this case.

22.    Teacher Sue Stephopolus observed two female students, each of whom was seated on Defendant Alvarez' knees at the same time.

23.     Sue Stephopolus acted under color of state law during all time periods relevant to this case.

24.     Teacher Karen Ward observed two female students, each of whom was seated on Defendant Alvarez' knees at the same time.

25.     Karen Ward acted under color of state law during all time periods relevant to this case.

26.     The Before School Care Program at Hamilton Elementary School allowed parents to drop of children at school as early as 6:30 a.m.

27.     On December 21, 2000, at approximately 7:30 a.m., Alvarez asked Bair to allow him to take Katherine to his classroom to help him with work.

        a.     This was approximately one hour before regular school hours.

28.     Bair, on that date, released Katherine to Alvarez.

29.     Bair was not expressly authorized to release Katherine to Alvarez.

30.     On the registration form for the Before School Care Program, there is a space where a parent or guardian can list individuals whom the Program is authorized to release the child to. Alvarez was not so listed by Katherine's parents during any time period relevant to this action.

31.     Once inside his classroom, Alvarez sat Katherine on his lap and inappropriately touched and fondled her body, including but not limited to her breasts, buttocks, and vaginal area.

32.     Katherine did not tell anyone about this occurrence on December 21, 2000.

33.     On December 22, 2000 at approximately 7:30 a.m., Alvarez again asked Bair to allow Katherine to come with him to his classroom.

34.     Bair again allowed Alvarez to take Katherine to his classroom.

35.     Alvarez again inappropriately touched Katherine in the same manner as the day before.

36.     Katherine, however, pushed Alvarez's hand away, told Alvarez that she did not like it, and to stop touching her.

37.     Alvarez stopped touching her and admonished Katherine not to tell anyone about what had occurred.

38.     That evening, Katherine told her father what had occurred.  Mr. Neimer called the police immediately.

39.     After investigation, Alvarez was arrested, and was charged with two counts of Indecent Assault and one count of Corruption of the Morals of a Minor.

40.     On August 6, 2001, Alvarez pled guilty to the charges.

41.     On October 5, 2001, Alvarez was sentenced by the Court of Common Pleas of Lancaster County, Pennsylvania to eight (8) to twenty three (23) months in prison, plus two (2) consecutive years of probation, fines, restitution, and the requirement that he register his whereabouts for the next ten (10) years under Pennsylvania's version of Megan's Law.

42.     The LRC had an informal policy, communicated to Bair, of allowing children in the Before School Care Program to be released to their teachers, before school hours, without parental authorization, with only the child's consent.

43.     Bair released Katherine to Alvarez without the authorization of Katherine's parents.

44.     The Informal Policy contradicted the written policy, which was communicated to parents in the advertising flyer and parent handbook, of not releasing the child to anyone without parental consent.

45.    The LRC did not require training in recognition of child abuse or identification of abusers.

## IV.    ANTICIPATED DISPUTED LEGAL ISSUES

**A.    Whether the City of Lancaster has a connection to the School Age Care/Before School Care Program so as to expose it to liability.**

The City has claimed that it should be released from the suit because it had no connection with the School Age Care program.  This contention is without merit.  The LRC runs the Program.  The LRC, however, is, according to Yeager, "associated with the City."  (N.T. Yeager, Page 4).  There has been no evidence adduced that the LRC is independent of the City. Indeed, there was testimony in the depositions of officials of a Partnership Agreement between the City and the LRC for the School Age Care Program. Accordingly, the City is liable for the actions of state actors in a City-associated department running a day care program, and should remain as a defendant in this case.

**B.    Whether Defendants, LRC and City of Lancaster failed to train, supervise, and monitor employees of the School Age Care/Before School Care Program.**

The claims against the City and the LRC, arise from the failure of these entities to train day care providers, supervise these providers, and monitor their activities, and that this action caused the deprivation of rights to Katherine (sexual assault by a teacher). Bair, in her deposition, testified that she possesses certain relevant educational and experiential prerequisites for directing a day care program.  Yeager testified in his deposition to these qualifications.  This education and experience, however, is irrelevant

to the determination of whether Katherine's rights were violated.  Whether or not training was held on formal policies, as moving Defendants claim, is equally irrelevant. The testimony of Yeager, Bair, and Abele clearly establishes an unwritten (and unlawful) policy of allowing day care employees to release students in the School Age Care Program, before school hours, to their teachers.  Such a policy allows teachers access to children, and an opportunity to take children alone to remote parts of the building.  The underlying rationale of the unwritten policy, as explained by Bair and Abele was that the teacher would come down in another hour to take the students to class, so they saw no problem with allowing the teacher to take the child before school hours.  This explanation, however, misses the important point that during school hours, the child is in the presence of the teacher with other children and other adults, and sexual abuse or assault is highly unlikely.  Before school hours, by contrast, the teacher has far greater opportunity to be alone with the child.  While most teachers do not molest or sexually abuse children, a policy or custom such as the one described by Bair and Abele would provide a pedophile or sexual predator with the access and opportunity which he or she requires to carry out his or her evil intentions. Training of day care providers should have included emphasis on the need for proper supervision of children, and questioning of (and denial of) requests by unauthorized adults for access to children.

**C.     Whether the act of releasing students in the Before School Care Program to teachers in the School, without parental authorization, before school hours, was a "custom, policy, or practice" of the City and the LRC.**

A municipal policy or custom may be established (1) when a decision maker possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy or edict or (2) through a course of conduct when, though not authorized by law, such practices of state officials are so permanent and well-settled as to virtually constitute law. *Jarlett v. Callis*, 2001 U.S. Dist. LEXIS 10540 (E.D.Pa. 2001). The City and the LRC claim there was no "custom, practice, or policy" on the part of these entities which led to the deprivation of Katherine's rights, as described in *Monell v. Department of Social Services*, 436 U.S. 658 (1978). There is a clearly established constitutional right to "bodily integrity, under the Due Process Clause, and that right "encompasses a student's right to be free from sexual assaults by his or her teachers." *Stoneking v. Bradford Area School District*, 882 F.2d 720 at 726 (3d Cir. 1989). It is Plaintiffs' position that the unwritten policy of the Before School Care Program to release children to their teachers without the consent of their parent or guardian (see, N.T., Bair, Pages 33-34; N.T. Abele, Pages 15-16), which violates both the written policy and state regulations relating to day care providers, is directly responsible for the deprivation of rights in question. The state regulation breached by Defendants, is found in the Pennsylvania Code provisions relating to day care. This regulation prohibits release of a child to anyone other than the parent or guardian without the written consent of the parent, except in an emergency. 55 Pa. Code Section 3270.117.

**D.    Whether Defendants, LRC and City of Lancaster, acted with deliberate indifference to Katherine's federally protected rights.**

Liability for failure to supervise and train "may happen in the light of the duties assigned to the specific officers or employees, the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."  ***City of Canton v. Harris,*** 489 U.S. 378 (1989). The actions of the City and the LRC with respect to the conduct of the School Age Care Program and release of students to a teacher known to have bizarre teaching style and unhealthy boundaries with the children before school hours amounted to deliberate indifference to Katherine's right to freedom from sexual assaults.  In the case of *Jordan v. City of Philadelphia,* 2000 U.S. Dist. LEXIS 3151 (E.D.Pa., March 20, 2000), the plaintiff, who was fifteen years of age and had been adjudicated as delinquent and placed in the Philadelphia Youth Study Center, was housed in a room known as the "shower room" with a nineteen year old offender.  It was the custom of the Youth Study Center to assign roommates without regard to age, physical size, and offense history.  The older inmate, was an adult, considerably larger, and more aggressive than the fifteen year old plaintiff.  The plaintiff's suit under 42 U.S.C. Section 1983 stemmed from a sexual assault by the older inmate.  The City of Philadelphia moved for summary judgment on the grounds that it was unaware of the older inmate's propensity for sexually deviant behavior, and, thus, could not have been deliberately indifferent to or violated plaintiff's right to bodily integrity and freedom from sexual assaults.  The Court denied the motion, finding issues of fact with respect to notice and deliberate indifference to

the rights of the juvenile to freedom from sexual assaults and abuse.

In the instant case, employees of the City and LRC had a policy/custom, which, while unwritten (like that of the YSC in *Jordan)*, was generally recognized as the rule, of releasing students to teachers before school hours. This policy gave Alvarez sole access to Katherine, a nine year old girl. Alvarez was far larger in size, stature, and strength than Katherine, was approximately fifty years of age, and was in a position of power over Katherine. The policy/custom allowed an older male teacher to be alone for a long period of time with a female student, facilitating opportunity for sexually assaultive behavior. In today's climate where it is well known that children are, at times, targeted for molestation by "trusted" adults, including teachers, such a policy/custom was unacceptable, and deliberately indifferent to Katherine's rights.

## V.    PROPOSED POINTS FOR CHARGE

1.    A child may not be released by a day care provider to any person other than his or her parent or guardian. **55 Pa. Code Section 3270.117**.

2.    42 U.S.C. Section 1983 "provides for the imposition of liability on any person who, acting under color of state law, deprives another of rights, privileges, or immunities secured by the Constitution or laws of the United States." **42 U.S.C. Section 1983.**

3.    To state a claim under Section 1983, the Plaintiffs must show both that: (a) the offending conduct was committed by a person acting under color of state law; and (b) such conduct deprived the Plaintiffs of rights secured by the Constitution of the

United States. *Callahan v. Lancaster-Lebanon Intermediate Unit 13, et al.*, 880 F.Supp. 319 at 325-26 (E.D.Pa. 1994), citing *Parratt v. Taylor,* 451 U.S. 527 at 535 (1981).

4.    A defendant may be liable under 42 U.S.C. Section 1983 if it, "with deliberate indifference to the consequences, established and maintained a policy, practice, or custom which directly caused [plaintiff] constitutional harm*." Stoneking v. Bradford Area School District*, 882 F. 2d 720 at 725 (3d Cir. 1989).

5.    The right to "freedom from invasion of one's personal security through sexual abuse" is an established constitutional right. *Stoneking v. Bradford Area School District*, 882 F. 2d 720 at 727 (3d Cir. 1989).

6.    Local governments may be held to answer for constitutional violations caused by official policy or custom of the municipality.  *Callahan v. Lancaster-Lebanon Intermediate Unit 13, et al.*, 880 F.Supp. 319 at 340 (E.D.Pa. 1994), citing *Monell v. New York City Department of Social Services*, 436 U.S. 658 at 694 (1978).

7.    The Supreme Court defined such a municipal policy as a "statement, ordinance, regulation, or decision officially adopted and promulgated by a local governing body's officers." *Callahan v. Lancaster-Lebanon Intermediate Unit 13, et al.*, 880 F.Supp. 319 at 340 (E.D.Pa. 1994), citing *Monell v. New York City Department of Social Services*, 436 U.S. 658 at 690 (1978).

8.    A municipal custom for Section 1983 purposes is such practices of state officials as are so permanent and well settled so as to constitute a custom or usage with the force of law.  *Callahan v. Lancaster-Lebanon Intermediate Unit 13, et al.*, 880 F.Supp. 319 at 340 (E.D.Pa. 1994), citing *Monell v. New York City Department of Social Services*, 436 U.S. 658 at 691 (1978); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144 at 167-68 (1970); *Oklahoma City v. Tuttle,* 471 U.S. 808 at 820-824 (1985).

9.    A municipal policy or custom may be established (1) when a decision maker possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy or edict or (2) through a course of conduct when, though not authorized by law, such practices of state officials are so permanent and well-settled as to virtually constitute law.  *Jarlett v. Callis*, 2001 U.S. Dist. LEXIS 10540 (E.D.Pa. 2001).

10.    Municipal liability under § 1983 can extend to a governing body's failure to train, supervise and discipline its officers.  *City of Canton v. Harris*, 489 U.S. 378 (1989).

11.    Liability for failure to supervise and train "may happen in the light of the duties assigned to the specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton v. Harris*, 489 U.S. 378 (1989).

12.    Liability under the failure to train theory can be premised on (1) failure by a government unit to act in response to repeated complaints of constitutional violations by its officers or (2) failure to provide adequate training in light of foreseeable serious consequences that could result from the lack of instruction. *City of Canton v. Harris*, 489 U.S. 378  at 390 (1989).

13.    Municipal entities are not entitled to the defense of qualified immunity. *Callahan v. Lancaster-Lebanon Intermediate Unit 13, et al.*, 880 F.Supp. 319 at 340 (E.D.Pa. 1994), citing *Owen v. City of Independence*, 445 U.S. 622 (1980).

14.    A governing body "may be sued for constitutional deprivations visited pursuant to governmental 'customs', 'practices', or 'usage'. ***Monell v. New York City Department of Social Services***, 436 U.S. 658 at 690-691 (1978).

15.    A government unit may be liable under 42 U.S.C. Section 1983 for practices, customs, and policies [creating] a climate which … facilitated sexual abuse of students by teachers … and [where there is] a casual relationship between these practices, customs, or policies and the repeated sexual assaults. ***Stoneking***, 882 F. 2d at 725.

16.    State actors "have an affirmative duty to protect students in public schools from abusive conduct by their teachers."  ***K.L. v. Southeast Delco School District,*** 828 F.Supp. 1192 at 1195 (E.D.Pa. 1993).

17.    A student has "a firmly established constitutional right under the due process and equal protection clauses of the Fourteenth Amendment to be free from sexual molestation by a state-employed schoolteacher."  ***K.L. v. Southeast Delco School District,*** 828 F.Supp. 1192 at 1195) E.D.Pa. 1993).

Respectfully Submitted,

REIFF & BILY


_____

Raymond Bily, Esquire
1429 Walnut Street
12th Floor
Philadelphia, PA 19102
(215) 246-9000

RAYMOND M. BILY, ESQUIRE
REIFF AND BILY
Identification No. 44677

ATTORNEY FOR PLAINTIFF

1429 Walnut Street
12th Floor
Philadelphia, Pa. 19102
215) 246-9000

| | |
|---|---|
| KATHERINE ELIZABETH NEIMER, a minor<br>by and through JAMES J. NEIMER and<br>REBECCA NEIMER, her parents and natural guardians | :<br>:<br>:<br>: EASTERN DISTRICT OF PENNSYLVANIA |
| vs. | :<br>: |
| LANCASTER SCHOOL DISTRICT; CITY OF<br>LANCASTER; LANCASTER RECREATION<br>COMMISSION; VICKI PHILLIPS, Individually<br>and in her capacity as Superintendent of the<br>Lancaster School District; GLORIA CAMPBELL,<br>Individually and in her capacity as building principal<br>of Hamilton elementary School; ISMAEL ALVAREZ<br>and DONALD YEAGER, Individually and in his<br>capacity as Director of the Lancaster County<br>Recreation Commission's School Age Care Program | : CIVIL ACTION NO. 02-CV-4034<br>: HONORABLE CLARENCE C. NEWCOMER<br>:<br>:<br>:<br>:<br>: JURY TRIAL DEMANDED<br>:<br>:<br>:<br>: |

## CERTIFICATE OF SERVICE

I, Raymond M. Bily, Esquire, hereby certify that a true and correct copy of the foregoing Pre-Trial Memoradum has been served this date upon al interested counsel by way of United States First Class Mail, postage prepaid, addressed as follows:

Paul F. Lantieri, Esquire
Bennett, Bricklin & Saltzburg, LP
Liberty Place
313 West Liberty Street, Suite 371
Lancaster, PA 17603
(Counsel for Defendants, City of Lancaster,
Lancaster Recreation Commission and Donald Yeager)

Christopher S. Underhill, Esquire
Hartman, Underhill & Brubaker, LLP
221 East Chestnut Street
Lancaster, PA 17602
(Counsel for Defendants, City of Lancaster,
Lancaster Recreation Commission)

Maura E. Fay, Esquire
Dilworth Paxson, LLP
3200 Mellon Center
1735 Market Street
Philadelphia, PA 19103-7599
(Counsel for Lancaster School District,
Vicki Phillips and Gloria Campbell)

Edward H. Rubenstone, Esquire
Groen, Lamm, Goldberg & Rubenstone, LLC
Four Greenwood Square, Suite 200
Bensalem, PA 19020
(Counsel for Defendant, Ismael Alvarez)

_____
RAYMOND M. BILY, ESQUIRE

Dated:  October  22, 2003