## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KATHERINE ELIZABETH NEIMER, a minor, by and through JAMES J. NEIMER and REBECCA NEIMER, her parents and natural guardians, | : : : : : : | Docket No: 02-CV-4034<br><br>Consolidated with No. 03-CV-5922 |
| Plaintiffs, | : : | JURY TRIAL DEMANDED |
| v. | : : | |
| THE DISTRICT OF LANCASTER SCHOOL BOARD, et al., | : : : : | |
| Defendants. | : | |

### REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION TO PRECLUDE DR. STEVEN SAMUEL FROM TESTIFYING

By Motion dated December 15, 2003, defendants the Board of School Directors of the School District of Lancaster, Arthur Mann, Arthur Dodge, III, Daniel Desmond, Gina Brown, Peter Horn, Patrice Dixon, Michael Rowan, Helen Duncan, Michael Winterstein, Margaret Aulisio, Dianna King, William Way, Sue Stathopulos, and Karen Ward (collectively referred to as "the School defendants") moved to preclude plaintiffs James Neimer, Rebecca Neimer and Katherine Neimer ("plaintiff Neimer") from presenting at trial the testimony of their second proposed expert, Dr. Steven Samuel ("Motion to Preclude"). On December 19, 2003 plaintiffs filed an Opposition to the Motion to Preclude ("Plaintiffs' Opposition"). Through their Opposition, plaintiffs discount the applicability of bad faith considerations to a Rule 37 motion, and argue, instead, that their delay in identifying Dr. Samuel was "justified" (Plaintiffs' Opposition, pp. 3-4) and that the School Defendants were not prejudiced by this belated identification.

### ARGUMENT

The notion that bad faith is not a factor for this Court's consideration rests on *PPG Industries, Inc. v. Zurawin*, 2002 WL 31289285, Nos. 01-4417, 00-4491 (3ᵈ Cir. 2002), which plaintiffs contend stands for the proposition that the district court may *only* consider prejudice in determining whether to preclude

expert testimony.  Notably, plaintiffs rely on *PPG Industries* even though it was designated by the Circuit Court as non-precedential.[1]

Moreover, *PPG Industries* does not stand for the proposition that bad faith is not a consideration in a Rule 37(c)(1) motion.  The *PPG Industries* Court merely explained the different considerations it weighs when the issue on appeal is the District Court's decision to exclude evidence as a sanction under Rule 37 as contrasted with the District Court's decision not to exclude evidence under that rule.  Contrary to plaintiffs' characterization, *PPG Industries* does not hold that a District Court is *prohibited* from examining bad faith when considering a Rule 37(c)(1) motion.  To the contrary, *PPG Industries* relies on *Newman v. GHS Osteopathic*, 60 F.3d 153, 156 (3d Cir. 1995), which specifically considered bad faith and expressly found that "there was no reason to believe that [the non-moving party] acted in bad faith..."  Moreover, cases since *PPG Industries* make clear that district courts *should* consider the *Pennypack* factors[2] in deciding whether to impose Rule 37 sanctions, including bad faith or willfulness in failing to comply with the district court's orders.  *See Astrazenica AB v. Mutual Pharmaceutical Co.*, 278 F. Supp. 2d 491, 504 (E.D. Pa. 2003); *Gallup, Inc. v. Kenexa Corp.*, 2003 U.S. Dist. Lexis 9821, *6-7, C.A. No. 00-5523 (E.D. Pa., May 30, 2003); *Philadelphia Cervical Collar v. Jerome Medical*, 2003 U.S. Dist. Lexis 6572, *10, C.A. No. 00-2515 (E.D. Pa., April 1, 2003); *Borden v. Ingersoll-Rand Co.*, 2003 U.S. Dist. Lexis 1272, *7, C.A. No. 01-5455 (E.D. Pa., Jan. 17, 2003).

The bad faith present here compels the conclusion that Dr. Samuel should be precluded from testifying at trial.  Plaintiffs' entire justification for proffering Dr. Samuel at this late date is plaintiff

---

[1] The Third Circuit Court of Appeals does not cite its non-precedential opinions as authority.  Third Circuit Internal Operating Procedure 5.7; *United States v. Singh*, 224 F. Supp. 2d 962, 965 n.5 (E.D. Pa. 2002).  In fact, the Third Circuit Internal Operating Procedures describe a non-precedential opinion as one having "value only to the trial court or the parties."  Third Circuit Internal Operating Procedure 5.3.

[2] Those factors are: (1) the prejudice or surprise in fact of the party against whom the excluded witness would testify; (2) the ability of that party to cure the prejudice; (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case; and (4) bad faith or willfulness in failing to comply with the Court's order.  *Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 905 (3d Cir. 1977), *overruled on other grounds, Goodman v. Lukins Steel Co.*, 777 F.2d 113 (3d Cir. 1985).  These same factors appear in *In re TMI Litigation*, 193 F.3d 613 (3d Cir. 1999).

Neimer's supposed reaction to Alvarez "confronting" her on October 28, 2003.  Specifically, plaintiffs'

counsel describes the encounter between Alvarez and plaintiff Neimer on October 28 as one during which

(1) plaintiff Neimer reacted by "shaking, crying and clutching her mother after spending very little time in

the courtroom in Alvarez' presence;" (2) plaintiff Neimer was in "torment;" and (3) plaintiff Neimer was

"plagued with an overwhelming desire to run away the entire time the parties awaited commencement of

the trial."  Plaintiffs' Opposition, p. 4.  Plaintiffs' counsel says that upon observing and being advised of

plaintiff Neimer's response, he rushed to the telephone and reached Dr. Samuel -- a total stranger to the

proceedings and to plaintiff Neimer -- who opined that two trials would put plaintiff Neimer "over the

top" psychologically.  Plaintiffs' Opposition, p. 4.

Plaintiffs' counsel's rendition of the October 28 encounter between plaintiff Neimer and Alvarez

stands in stark contrast to how her parents described what really happened that day.  During her deposition

on December 23, 2003, plaintiff Neimer's mother explained her daughter's reaction to first seeing Alvarez

as follows:

- plaintiff Neimer saw Alvarez in the courthouse as he was getting off an elevator;

- plaintiff Neimer was surprised to see Alvarez;[3]

- plaintiff Neimer cried but her mother was able to calm her down;

- after she was calmed down, plaintiff Neimer was taken into the courtroom;

- plaintiff Neimer was "uncomfortable" while sitting in the courtroom; and

- plaintiff Neimer described seeing Alvarez as "hard," "difficult" and a "challenge."

A copy of an excerpt of Rebecca Neimer's deposition transcript is attached hereto as Exhibit 1.

---

[3] According to Mr. Neimer, they did not have sufficient time to prepare plaintiff Neimer for the trial, and a possible encounter with Alvarez, because they did not learn until the afternoon of October 27 that the case was going to trial the next day.  *See* Exhibit 2.  Mr. Neimer testified that had they had prior notice of the trial they "probably would have made arrangements for her to see Ms. Hosterman one time prior to that."  Plaintiffs should not be allowed to capitalize on plaintiff Neimer's surprise at seeing Alvarez for the first time when it was caused by their own counsel's failure to prepare them properly for the trial.

Plaintiff Neimer's father's recollection of the events of October 28th are also different than the summary of the events set forth in Plaintiffs' Opposition and, apparently, recounted to this Court, on October 28. James Neimer testified that:

- plaintiff Neimer and her mother saw Alvarez in the courthouse hallway, plaintiff Neimer began to cry, and before Mr. Neimer could turn around, Mrs. Neimer had taken plaintiff Neimer into a side room to calm her down;

- plaintiff Neimer seemed to calm down and was brought into the courtroom after Alvarez had entered;

- plaintiff Neimer was seated at a table across from Alvarez;

- plaintiff Neimer was "uncomfortable" sitting in the courtroom with Alvarez and avoided looking at him;

- plaintiff Neimer seemed "more confident the longer we were in the courtroom"; and

- afterwards, plaintiff Neimer said that while she was uncomfortable and "wouldn't have been happy about taking the stand and saying what I would have had to say in front of all those people about what happened because it's embarrassing" she "could have done it."

A copy of an excerpt of James Neimer's deposition transcript is attached hereto as Exhibit 2. None of these descriptions comes close to demonstrating the "tremendous emotional pain" plaintiffs' counsel apparently described to this Court on October 28, or to Dr. Samuel via the telephone, both of which are summarized in Plaintiffs' Opposition. Plaintiffs' Opposition, pp. 4, 6. Indeed, plaintiff Neimer was never "confronted" by Alvarez but unexpectedly ran into him in the elevator lobby of the Courthouse.

There is also no testimony that plaintiff Neimer had an "overwhelming desire to run away the entire time the parties awaited the commencement of trial," or that she was "shaking" and "crying" in the courtroom and/or otherwise "tormented" by the encounter. To the contrary, plaintiff Neimer's parents testified that she composed herself after seeing Alvarez, and although "uncomfortable" about having to tell her story to a group of strangers, had readied herself to do so.

Of course, even if the recitation of facts concerning plaintiff Neimer's reaction was true, plaintiffs fail to explain how these "facts" justify the identification of Dr. Samuel four months after the deadline

4

imposed by this Court and well outside the time requirements of Rule 26. Assuming plaintiff Neimer reacted negatively to seeing Mr. Alvarez for the first time since December 2000, it would seem logical to seek additional psychological treatment for plaintiff Neimer from her treating psychologist, not to obtain a new, second expert to address the alleged "psychological damage inflicted upon Katie by Alvarez' attack," especially since that is the subject of plaintiffs' original expert's opinion. Indeed, there is no explanation for how plaintiff Neimer's supposed reaction warrants an expert **who had never before examined or even met her.** There is also no excuse offered for why this evaluation could not have been obtained within the time period designated by the Court or under Rule 26.

It is equally stunning that Dr. Samuel "opined" over the telephone on the effect of two trials on plaintiff Neimer "due to the nature of the injury and Katie's manifest unresolved psychological issues" **when Dr. Samuel had never even met plaintiff Neimer!** The only reasonable conclusion -- which plaintiffs do not dispute -- is that plaintiffs' counsel had discussed this case with Dr. Samuel before the October 28 telephone call and was poised to designate him as an expert once this Court was persuaded to further delay the trial.[4] Notably, plaintiffs do not cite any cases to support the proposition that the mere desire to augment expert testimony constitutes "substantial justification" under Rule 37.

It is equally obvious that the School defendants will be prejudiced by the eleventh hour addition of Dr. Samuel as an expert. As explained in the Motion to Preclude, the School defendants were given eight weeks from the commencement of Case #3 to: (1) retain counsel; (2) move to dismiss Case #3; (3) conduct all discovery they needed; (4) mediate this dispute; and (5) prepare for trial. With all that had to be completed in the time allotted, and the delays attributable to the plaintiffs, the School defendants were not able to obtain the plaintiffs' testimony until the last two days of the eight week period-December 22 and 23, 2003. Clearly, the School defendants did not have an opportunity to designate an expert to counter concerns raised by Dr. Samuel, none of which seemed to present themselves until after this Court

---

[4] The School defendants assume plaintiffs want to replace their original expert because she opined that plaintiff Neimer "ha[d] no diagnosable psychological disorder." Tellingly, plaintiffs do not contest this conclusion in their Opposition.

agreed to put off the trial.[5]  As such, the School defendants' defense will be severely prejudiced if plaintiffs' last minute attempt to change their theory and amount of damages is not rejected by this Court. Because plaintiffs' belated designation of Dr. Samuel is not harmless, Rule 37 requires that plaintiffs be precluded from using him as a witness at trial.  Fed. R. Civ. P. 37(c)(1).

## CONCLUSION

For all the foregoing reasons, as well as those set forth in the School defendants' Motion to Preclude Dr. Steven Samuel from Testifying, the School defendants pray for an Order precluding Dr. Samuel from testifying as an expert witness for plaintiffs in their cases.

Respectfully submitted,

DATED: December 30, 2003

Maura E. Fay (No. 50814)
Joshua D. Groff (No. 86191)
DILWORTH PAXSON LLP
3200 Mellon Bank Center
1735 Market Street
Philadelphia, PA 19103
215-575-7000

---

[5] Whether or not plaintiffs offered to make Dr. Samuel available for deposition is beside the point.  In fact, plaintiffs initially offered to make Dr. Samuel available for deposition as a way of avoiding a deposition of Ms. Hosterman.  *See* Exhibit B to Plaintiffs' Opposition. By way of response, plaintiffs' counsel was advised that the deposition of Dr. Samuel was not a priority for the School defendants.  *See* Exhibit 3 hereto.  Indeed, deposing Dr. Samuel would have only used up time the School defendants otherwise needed to prepare for trial.  Under no circumstances would deposing Dr. Samuel have changed the fact that the School defendants did not have time to obtain an expert to counter Dr. Samuel's opinions.  Importantly, plaintiffs never address the prejudice caused to the School defendants by the lack of an opportunity to designate an expert.

# **EXHIBIT 1**

1    And I think she didn't have time -- you know, it

2    was -- we just ran into him.  He was getting off

3    the elevator.  So there wasn't -- it was just kind

4    of like "boom," all of a sudden and I don't think

5    she expected it to be -- if she was going to run

6    into him that it would be that way.  She was

7    upset.  Cried.  So I took her to the side and

8    provided support.

9         Q.    Did you calm her down?

10        A.    Yes.

11        Q.    Did she stop crying?

12        A.    Yes.

13        Q.    Anything else you can tell me about

14   her reaction?

15        A.    She talked about it a little bit

16   later.  You know it was hard.  Mostly, it was

17   difficult.

18        Q.    Did you then take her into the

19   courtroom itself?

20        A.    Yes.  We were directed to do that.

21        Q.    Did she see Mr. Alvarez in the

22   courtroom as well?

23        A.    I'm sure she did.  He was there.

24        Q.    Did she react at all when she saw

70

1    him in the courtroom?

2          A.        She felt uncomfortable.  There was

3    an uncomfortable -- I think she felt safe because

4    we were there to protect her and, you know, I

5    think just kind of helping her in the hallway.

6          Q.        Is there anything else you remember

7    about Katie's reaction when she saw Mr. Alvarez

8    either the first time or the second time?

9          A.        Are you talking about outside the

10   courtroom the first time.

11         Q.        Exactly.  I'm segregating the

12   hallway encounter which, as I understand, is the

13   first encounter, and then later seeing him in the

14   courtroom.  Are these the only two times she saw

15   him that day?

16         A.        I believe so.

17         Q.        Okay.

18         A.        You know, maybe on the way out he

19   was walking down the road or something.  I don't

20   recall specifically.  Just -- it was very

21   difficult for her.  It was a challenge.  And, you

22   know, I think just talking to her and trying to

23   provide her with additional support, and helping

24   here to work through that; and then I think Jim

71

1    and I being there and her not being right up next

2    to him and not having to look at him.  I tried to

3    place myself so that she wouldn't have to face

4    him.

5         Q.       After the trial was called off, I'll

6    call it on that day that you were in court -- you

7    remember the trial didn't go forward; right?

8         A.       Yes.

9         Q.       Did Katie talk to you at all about

10   seeing Mr. Alvarez?

11        A.       She did talk about that it was hard;

12   that it was difficult for her to see him there.

13   But again I tried not to press it and bring it up.

14   I'm more than willing to talk about it when she

15   brings it up to me, which she did bring it up and

16   said how it was hard and a challenge.

17

18   END OF THE PAGES

19

20        Q.       Is Katie on any medications

21   presently?

22        A.       No.

23        Q.       Knee the me yesterday <WHAOE> saw

24   <TKRFPLTD> Sam <WUL>.  <SHOEFS> on <AEPBT> bake Z

# **EXHIBIT 2**

63

1       Q.    Did she ever draw your attention to

2   the fact that leaving in the middle of the day or

3   during the school day was drawing attention to

4   her?

5       A.    Not that I remember.  We would

6   schedule them as close as we could to the end of

7   the school day, so she would just have to leave a

8   little bit early.  And I don't know if she was

9   ever questioned about it.

10      Q.    It wasn't something that came up in

11  your conversations with her?

12      A.    Not that I remember.

13      Q.    Now Katie was reseen by Ms.

14  Hostermann in June of this past year or this year;

15  is that right?

16      A.    Yes.

17      Q.    Why was that done?

18      A.    It was in preparation for the

19  deposition.  We didn't really know what we would

20  be walking into.  So we wanted her to have a

21  session with Ms. Hosterman just prior to the

22  deposition and to sort of help her prepare.  I

23  mean we could do -- my wife and I could do certain

24  things to prepare her for it but we wanted to have

ESQUIRE DEPOSITION SERVICES

1    a professional involved also.

2        Q.      Did you consider having a similar

3    session for Katie scheduled right before the

4    trial?

5        A.      Are we talking about -- I'm a little

6    confused by your question.  Are we talking about

7    the criminal end or the civil end?

8        Q.      No, the civil trial.  And I agree

9    with you, it's a confusing question.  So let me

10   back up.  As I understand it, the original case

11   that was instituted on Katie's behalf was to try

12   on October 28th.  And I think you all appeared at

13   the courthouse for the beginning of the trial.  My

14   question is prior to October 28th, was there an

15   effort made or a contemplation of having Katie

16   examined by Ms. Hostermann before that trial?

17       A.      We only had real short notice that

18   the Katie was -- we were going to be going for

19   that.  We went down for the settlement conference

20   and we were made aware that the trial was going to

21   go the next morning.  So there was no time to set

22   that up or we probably would have made

23   arrangements for her to see Ms. Hosterman one time

24   prior to that.  It was too short of a notice to

65

1        set up an appointment.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

65

1      Q.     Had you been advised by prior

2  counsel that the case was going to try in

3  September?

4      A.     I don't think we were ever made

5  aware of that.

6      Q.     I've asked your wife some questions

7  about when Katie first saw Mr. Alvarez on that

8  morning of October 28th.  Is her description of

9  what happened in any way different from your

10  recollection?

11     A.     I don't remember exactly.  I'm

12  probably better to try to say it -- it may be the

13  same -- it may be the same thing.  I remember I

14  was walking with Mr. Bily and we were probably

15  three or four strides ahead of Becky and Katie.

16  And Katie saw Alvarez and she immediately started

17  crying.  And Becky saw the reaction and took her

18  off to like the side of the hallway.  I think she

19  night have actually gone in a conference room.

20  And I kind of turned around and they were gone.  I

21  heard Katie crying.  By the time I turned around,

22  they were gone.  And then I was -- Mr. Bily and I

23  were talking about something else.  I'm trying to

24  remember exactly what it was.

1    Q.    I don't want to know what you talked

2    about with your lawyer.

3              MR. BILY:  If it's material.

4    A.    Yes, we were talking about something

5    and they were just a couple strides behind and as

6    I saw her crying she was gone.

7              I turned around.  I  said, Okay I

8    know exactly -- here's Alvarez.  There is Katie.

9    I heard the crying.  She is off into the other

10   room with Becky.  Becky noticed that much before I

11   did, and took her off into the room, for lack a

12   better word.  I don't know whether they call it --

13   there was a side room there.  She took her in

14   there to kind of so she wouldn't have to look at

15   him.

16   Q.    Anything else about that encounter

17   that you remember?

18   A.    And Becky tried to calm her down.  I

19   talked with Mr. Bily and meantime Alvarez went

20   into the courtroom with his counsel.  And then we

21   went back out and got Becky and Katie and they

22   came in and sat down down at one table and Alvarez

23   was seated at a table across the room.

24             She seemed to calm down a little

67

1    bit.  You can tell she didn't want to look at him.

2    She sat there at a table with myself and Becky and

3    he was seated off to her right.  And she really

4    didn't look his way in the room.  She looked

5    straight and she didn't want to look over at him.

6              She didn't verbalize that but you

7    could tell by her body language that she was

8    uncomfortable being in the same room with him,

9    after what had happened.

10        Q.       I'm sure you weren't very

11   comfortable either?

12        A.       No, I wasn't.

13        Q.       Anything else about that encounter

14   that you want to tell me about?

15        A.       She seemed to be more confident the

16   longer that we were in the courtroom and in fact

17   she made a point of telling me after everything

18   was over that day:  Dad, I really felt

19   uncomfortable in the courtoom, but I wouldn't have

20   been happy about taking the stand and saying what

21   I would have had to say in front of all those

22   people about what happened because it's

23   embarassing but she said, you know what, if I had

24   to to do it I could have done it.

# **EXHIBIT 3**

# DILWORTH PAXSON LLP

## LAW OFFICES

DIRECT DIAL NUMBER:                                                                    Maura E. Fay
215-575-7252                                                                    mfay@dilworthlaw.com

November 20, 2003

**VIA TELECOPY**

Raymond M. Bily, Esquire
Reiff and Bily
1429 Walnut Street, 12th Floor
Philadelphia, PA 19102

      RE:   **Neimer v. The District of Lancaster School Board, et al.**
             **02-CV-4034; 03-CV-5922**

Dear Mr. Bily:

      By letter received this morning you advised me that you could produce the Neimers for deposition on Monday, November 24, and that you were able to make Dr. Samuel available on either December 2 or 17, 2003.

      While I do not purport to speak for the other counsel in this matter who, for some reason, were not copied on your letter to me, I am writing to advise you that I am not available to take the Neimers' depositions next Monday. Please advise me whether or not the Neimers can make themselves available on December 4 as noticed. If not, please provide me and the other defense counsel with alternate dates on which the Neimers would be available to be deposed.

      Your suggestions regarding Dr. Samuel are also unresponsive to my notice for Ms. Hosterman's deposition. First, neither your letter of November 12, 2003, nor the letter received this morning, state that you are withdrawing Ms. Hosterman as an expert witness. Second, and as stated in my letter to you of November 13, 2003, your identification of Dr. Samuel is four months too late. Third, whether or not you intend to call Ms. Hosterman, she was Katherine Neimer's treating psychologist for nine months. As such, Ms. Hosterman is a fact witness. If your letter was meant to advise me that you will not produce Ms. Hosterman voluntarily, that is fine. Please clarify your position on this immediately so I can issue a subpoena to Ms. Hosterman to appear on December 8.

3200 MELLON BANK CENTER  •  1735 MARKET STREET  •  PHILADELPHIA PA 19103-7595
(215) 575-7000  •  FAX (215) 575-7200  •  www.dilworthlaw.com

CHERRY HILL NJ     HARRISBURG PA     NEPTUNE NJ     NEWTOWN SQUARE PA     WASHINGTON DC     WILMINGTON DE

Dilworth Paxson LLP                                                                          Page 2
To:      Raymond M. Bily, Esquire

      Lastly, be advised that I have not yet decided whether or not I wish to depose Dr. Samuel. Out of an abundance of caution I suggest you advise Dr. Samuel to keep December 17 open for this purpose.  If I decide to proceed with that discovery I will issue a notice of deposition for the 17th.

                                        Very truly yours,

                                        Maura E. Fay

c:       Christopher Underhill, Esquire (via telecopy)
        Paul Lantieri, Esquire (via telecopy)
        Edward Rubenstone, Esquire (via telecopy)

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing Reply Memorandum was served this 30th day of December, 2003 on all counsel of record as indicated below:

**VIA HAND DELIVERY**
Raymond M. Bily, Esquire
Reiff and Bily
1429 Walnut Street, 12th Floor
Philadelphia, PA 19102

**VIA FIRST CLASS MAIL, POSTAGE PREPAID**
Paul F. Lantieri, Esquire
Bennett Bricklin & Saltzburgh LLP
313 West Liberty Street
Suite 371
Lancaster, PA 17603

Christopher S. Underhill, Esquire
Hartman Underhill & Brubaker LLP
221 East Chestnut Street
Lancaster, PA 17602-2782

Edward H. Rubenstone, Esquire
Groen, Lamm, Goldberg & Rubenstone, LLC
Four Greenwood Square
Suite 200
Bensalem, PA 19020

Joshua D. Groff